UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

FORREST G. SANDERS,

                                        Plaintiff,

            v.                                                7:05-CV-1155
                                                              (LEK/GJD)
COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.

_____

LAWRENCE D. HASSELER, ESQ., for Plaintiff
ARTHUR SWERDLOFF, Special Asst. U.S. Attorney for Defendant
WILLIAM H. PEASE, Asst. U.S. Attorney for Defendant

GUSTAVE J. DI BIANCO, Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred to me for report and recommendation by the Honorable

Lawrence E. Kahn, Senior United States District Judge, pursuant to 28 U.S.C. §

636(b) and Local Rule 72.3(d).  This case has proceeded in accordance with General

Order 18.

## PROCEDURAL HISTORY

Plaintiff filed an application for disability insurance benefits on June 2, 2003.

(Administrative Transcript (T), 76-78).  The application was denied initially on July

28, 2003.  (T. 59).  Plaintiff requested a hearing before an Administrative Law Judge

(ALJ), and a hearing was held on February 1, 2005 by video-conference.  (T. 34-58).

At the hearing, plaintiff testified and a vocational expert testified.  *Id*.

In a decision dated April 29, 2005, the ALJ found that plaintiff was not

disabled.  (T. 10-16).  The ALJ's decision became the final decision of the

Commissioner when the Appeals Council denied plaintiff's request for review on August 24, 2005.  (T. 3-5).

## CONTENTIONS

The plaintiff makes the following claims:

1.  The ALJ failed to properly evaluate the medical opinions of record. (Plaintiff's Brief, 10-12)(Dkt. No. 6).

2.  The ALJ failed to properly determine plaintiff's residual functional capacity (RFC).  (Plaintiff's Brief, 12-13).

3.  There is no substantial evidence to support the ALJ's conclusion that there is significant work in the national economy that plaintiff could perform.  (Plaintiff's Brief, 13-16).

4.  The ALJ erroneously failed to properly evaluate plaintiff's credibility.[1] (Plaintiff's Brief, 16-18).

The defendant argues that the Commissioner's determination is supported by substantial evidence in the record, and must be affirmed.

## FACTS

**A.**   **Non-Medical Evidence and Testimony**

Plaintiff was 48 years old at the time of the ALJ's hearing, and has an eleventh grade education.  During his hearing before the ALJ, plaintiff stated that he tried to

---

[1]Plaintiff's fourth argument is labeled "Point V".  (T. 16).  There is no roman numeral "IV".

obtain his GED[2] on two occasions, but missed by "a couple of points."  (T. 43).

Plaintiff testified that he does not like "book work" or reading, but could "probably do

all right" if he were "tearing a motor apart."  (T. 43).  Plaintiff has a long work history

as a heavy laborer in the field of construction and mechanical jobs.  (T. 117-27).

Plaintiff stated that in April of 2002, he was working in construction at a job

which required constant bending underneath a boiler. (T. 38, 41).  On April 12, 2002,

plaintiff pulled a muscle in his leg, but continued to work that day, which aggravated

the injury. (T. 41).  The next day, plaintiff stated that he was practically unable to

walk, and was placed on light duty for several days.  (T. 41).  Plaintiff stated that his

back never returned to normal, and was been "bad ever since." (T. 41).  However,

plaintiff continued to work until August 27, 2002. (T. 38).  Plaintiff stated that in

August, he was "laid off for a week," and apparently never went back to work.[3]  (T.

41).  Plaintiff claims August 27, 2002 as his date of disability onset. (T. 38).

At the hearing, plaintiff testified that he was able to do some household chores,

such as using a snow blower and shoveling snow off his driveway.  According to

plaintiff, he did "what [he could] around the house." (T. 43).  Plaintiff stated that he

stopped washing dishes shortly before the hearing, but was still able to work in his

basement on mechanical things.  He testified that he had recently obtained a puppy

and was spending a lot of time with his puppy. (T. 43).  He did light housekeeping,

---

[2] General Equivalency Diploma.

[3] In the history portion of one of Dr. Walter Heap's reports, it states that in August of 2002, plaintiff was laid off for "a couple of weeks," and that after he was home for two or three days, he had a marked increase in pain and symptomatology. (T. 166).

including running errands for neighbors, but avoided frequently using the stairs in his home. (T. 44). Plaintiff stated that his back condition varied from day to day, and sometimes his back was weak and very tender. (T. 45-46). Although plaintiff liked to go fishing, he did not do that activity anymore because he could no longer sit in the boat. (T. 46). He stated that his friends had been telling him to try ice fishing, but he would not attempt it because the cold bothered his back. (T. 46).

Plaintiff stated that he tried to keep active and moving all the time, but had difficulty walking on hard floors, and had difficulty sitting in soft chairs or low chairs. (T. 47). When he sat, plaintiff used a kitchen chair and sat on a pillow. (T. 48). Plaintiff testified that he was able to use a riding lawnmower, but drove very slowly to avoid bumps. (T. 48). Plaintiff was able to take care of his personal needs, although shaving and other chores bothered him. (T. 48).

Plaintiff stated that he did not like to use medications, and that he had been taking only one pain pill per day, even though the prescription would allow him to take three or four. (T. 49-50). He stated that at the time of the hearing, he had pain in his arms and shoulders, and that he occasionally rested in a reclining position for thirty minutes during the day. (T. 47). Plaintiff stated that he was given a Functional Capacity Examination (FCE) on January 10 and 11, 2005. He stated that his capacity on January 11 was average, but that his abilities and condition varied "constantly." (T. 45).

A vocational expert (VE) testified at plaintiff's hearing. (T. 52-58). The vocational expert testified that plaintiff would be unable to perform his past work,

4

which was heavy or very heavy and skilled or semi-skilled. (T. 54). Plaintiff's counsel utilized the FCE to question the vocational expert. Using the information from the FCE, the VE testified that plaintiff would have the RFC for "light work." (T. 55). Plaintiff's counsel then asked the VE a hypothetical question, which assumed that a person would require ***three ten-minute breaks at unpredictable times during the day, and where the person would be totally unable to function during those breaks***. (T. 55-56). The VE answered that if this ***always happened***, and the person was ***absolutely non-functioning each time***, that would ***probably*** not be tolerated in a work setting, and plaintiff would be viewed as requiring excessive rest periods. (T. 57)(emphasis added).

**B.    Medical Evidence**

### 1. *North Country Orthopaedic Group- Dr. Shuman, Dr. Peckham and Dr. Huang*

Plaintiff was referred to Dr. Shuman by plaintiff's chiropractor. Plaintiff was first examined by Dr. Shuman on September 5, 2002. (T. 212). Dr. Shuman reported that although plaintiff was injured on April 12, 2002, he continued to work despite his discomfort. (T. 212). Dr. Shuman found no tenderness around plaintiff's hips or thighs, normal tendon reflexes and motor strength with positive straight leg lifting on the left. X-rays did not show any evidence of fractures, dislocations, or spondylolysis. Dr. Shuman recommended McKenzie exercises, Celebrex, and light duty work, which included no prolonged driving and no lifting over fifteen pounds. (T. 213).

Plaintiff returned to Dr. Shuman on October 3, 2002 and December 13, 2002.

On each visit, plaintiff complained about pain in his right leg, and occasional numbness. (T. 211).  Dr. Shuman told plaintiff that he had mild bone spurs at the L4-5 level, and Dr. Shuman concluded that plaintiff had "mild degenerative disc disease, lower lumbar spine with right leg numbness and pain." (T. 211).  Dr. Shuman continued plaintiff's physical therapy, and gave plaintiff a note excusing plaintiff from work because of plaintiff's "partial disability."  (T. 211).  Dr. Shuman's examination found normal motor strength and deep tendon reflexes, with positive straight leg lifting on the right.  Dr. Shuman recommended a Magnetic Resonance Imaging (MRI) scan.

On January 9, 2003 plaintiff told Dr. Shuman that he was doing exercises "on his own." (T. 210).  Plaintiff stated that his condition was worse when sitting for any length of time.  Dr. Shuman found tenderness in plaintiff's lower lumbar spine, but intact motor function in both lower extremities.  Dr. Shuman stated that plaintiff had a "partial disability slip," stating that plaintiff could work provided he did not lift more than ten pounds or do any prolonged sitting. (T. 210).  Dr. Shuman continued to recommend an MRI and stated that plaintiff should continue taking Bextra.

On February 18, 2003, plaintiff returned to Dr. Shuman's office, but was examined by Dr. Arthur C. Peckham. (T. 210).  Plaintiff told Dr. Peckham that his pain had "drastically increased." (T. 210).  The MRI results showed that plaintiff had a "broad based disk bulge at L3-4 in addition to a right pericentral subligamentous disc hernation at L3-4." (T. 210).  Dr. Shuman's office note states that the disc herniation is "not described as being terribly significant." *Id.*  Dr. Peckham  recommended an

evaluation by a neurosurgeon "because of the severity of his symptoms."  (T. 210).

The M.R.I. report of February 12, 2003 states that plaintiff was suffering from:

"1.  Broad based disc bulge with right pericentral subligamentous disc herniation at L3-4 with only minimal focal canal stenosis at this level.  There is no foraminal encroachment.

2.  Minimal disc bulges at L4-5 and L5-S1 without spinal or foraminal stenosis."

(T. 209).

Plaintiff was examined by Dr. Shuman on March 13, 2003, and continued to complain of discomfort down his legs, with numbness and tingling in both legs.  (T. 207).  Plaintiff told Dr. Shuman that he had stopped taking Bextra because he was concerned about the medication "messing up his kidneys and liver."  Dr. Shuman found normal motor function and normal deep tendon reflexes. (T. 207).  Dr. Shuman's impression was that plaintiff had herniated disc at L3-4 and bulging discs at L4-5 and L5-S1.  Dr. Shuman recommended that plaintiff see a neurosurgeon.

During mid-March of 2003, plaintiff began seeing Dr. Howard H. Huang of the North Country Orthopaedic Group.  Dr. Huang examined plaintiff on March 18, 2003, and found that plaintiff's range of motion included fairly good forward flexion of the spine. (T. 201).  Dr. Huang also stated that seated distracted straight leg raising was "grossly negative," but the same tests in the supine position caused tightness of plaintiff's hamstrings on the right side.  Dr. Huang found normal muscle tone and

some tenderness at the L4 level, and found that certain maneuvers of the sacral, lumbosacral, and lumbar area "did not really elicit much pain." (T. 205).

Dr. Huang noted that plaintiff had "quite good strength." (T. 205).  Dr. Huang's impression was that plaintiff had low back pain, lumbar spondylosis, and lumbar degenerative disk disease with reported subligamentous hernation at L3-4. (T. 205). Dr. Huang did not make any recommendations for specific treatment after the March 18, 2003 examination because plaintiff was scheduled to see a neurosurgeon, and Dr. Huang stated that he would wait to hear the neurosurgeon's opinion. (T. 205).

On April 9, 2003, plaintiff told Dr. Huang that his symptoms had not changed from previous visits, although plaintiff had noticed some numbness into his left lower extremity, affecting his whole left leg. (T. 202).  However, Dr. Huang again found that seated distracted straight leg raise on right and left sides was grossly negative. Femoral stretch test was negative bilaterally. (T. 203).  Strength tests were a "probable 5/5," and muscle stretch reflexes were normal.  Dr. Huang discussed therapeutic epidural injections, as recommended by Dr. Shuman.  (T. 203).

On May 21, 2003, plaintiff returned to Dr. Huang, and reported that his low back pain had a "toothache" quality. (T. 202).  Dr. Huang continued to recommend the epidural injections, especially if plaintiff was experiencing discogenic pain. (T. 202). On August 14, 2003, plaintiff reported to a nurse practitioner that he had obtained some relief from an epidural steriod injection given on July 19, 2003. (T. 230).

8

Plaintiff returned to Dr. Huang on August 29, 2003, and reported that his pain was reduced slightly after the injection, but returned shortly thereafter. (T. 230).

Plaintiff's physical examination of August 29, 2003 was unchanged. (T. 230). Manual muscle testing still showed 5/5 strength of all tested muscles. (T. 230). Distracted straight leg raising and crossed straight leg raising were grossly negative bilaterally. Inspection of the lumbar spine was also "unchanged." (T. 230). Dr. Huang's notes indicate that he discussed a TENS unit and different medications with the plaintiff, or additional epidural steriod injections. (T. 230). Plaintiff declined another injection, and stated that he wished to continue more conservative measures. (T. 229).

Although plaintiff had been prescribed Mobic, he told Dr. Huang that he never tried the medication because "he forgot to take it." In plaintiff's words, "I always forget to take it." (T. 229). Dr. Huang suggested that he try to take the medication on a more consistent basis. (T. 229). On September 24, 2003, was examined by a nurse practitioner, and plaintiff reported that the Mobic did not help him. A larger dosage was recommended. Plaintiff was also given a prescription for Vicodin. (T. 229). Plaintiff had additional examinations at the North Country Orthopaedic office on October 22, 2003 and November 25, 2003. (T. 228). On February 5, 2004, plaintiff reported that moist heat helped his condition. (T. 227). At that time, Dr. Shuman stated that plaintiff had no pain with range of motion of his hips, but was slightly

tender around the greater trochanter joint. (T. 227).

Plaintiff's visits continued in 2004, including March 31, July 30, and October 30, 2004. (T. 225-26, 235).  During the March 31, 2004 examination, plaintiff reported that heat packs to his back and hips helped him. (T. 226).  However, plaintiff was not taking his Vicodin regularly.  Dr. Shuman's examination revealed that plaintiff was walking without any limp and had no tenderness around his groin. (T. 226).  Plaintiff also had full range of motion in his hip, with negative straight leg lifting tests, and his deep tendon reflexes were intact.  (T. 226).

On October 21, 2004, complained of cramping sensations in his right leg. (T. 235).  Plaintiff stated that the Vicodin seemed to exacerbate his problems.  Dr. Shuman examined plaintiff, and found that straight leg lifting tests were negative, his deep tendon reflexes were normal, his motor strength was normal, and his sensation was intact in both lower extremities. (T. 235).  Office notes indicate that plaintiff had a letter "from his lawyer wanting a functional capacity evaluation."  (T. 235).

## 2. *Dr. Walker Heap - Independent Medical Examination*

Dr. Walker Heap performed an Independent Medical Examination[4] of plaintiff on November 12, 2002. (T. 171-74).  In his report, Dr. Heap reviewed plaintiff's work and medical history. (T. 171-72).  Plaintiff reported to Dr. Heap that he slept "poorly," had difficulty getting into a comfortable position, and had pain which was aggravated

---

[4] Dr. Heap would be considered a consultative physician for purposes of Social Security.

by standing, walking, or lying down for long periods of time. (T. 172).  Plaintiff told

Dr. Heap that he was "not getting any better." (T. 172).

Upon examining plaintiff, Dr. Heap found no sensory deficit, a mild tenderness

at L5-S1, positive straight leg raising test on the right at thirty degrees, and negative

on the left to eighty degrees. (T. 173).  Dr. Heap's impression was that plaintiff had a

muscle ligamentous strain, resulting in mechanical back pain from repeated bending

and twisting.  (T. 173).  Dr. Heap's opinion was that plaintiff had a ***temporary partial***

***moderate disability***, and that although plaintiff was not able to do his regular work,

plaintiff was ***able to do sedentary work but must be able to frequently change***

***positions***.  (T. 174).  Dr. Heap recommended that plaintiff should be on a McKenzie

physical therapy program.  (T. 174).

On April 1, 2003, Dr. Heap reevaluated plaintiff and performed another physical

examination. (T. 165-70).  Dr. Heap reported that plaintiff complained of lower back

pain and left leg numbness. (T. 165).  According to Dr. Heap, plaintiff stated that his

condition had not really changed significantly except that plaintiff was having

numbness down his left leg.  Plaintiff believed his condition might have been getting

"a little worse." (T. 166).  Dr. Heap's examination found no sciatic notch tenderness,

mild sacral tenderness, and transverse process tenderness.  He found equal reflexes,

and no sensory changes in plaintiff's lower extremities.  Dr. Heap found no muscular

atrophy and negative straight leg raising tests on the left, and negative on the right to

11

ninety degrees. (T. 168). Dr. Heap's opinion was that plaintiff could not return to his previous work, but would be able to **perform light duty with a limitation of lifting to twenty pounds**. (T. 169).

### 3.  Dr. Michael P. Owen - Neurosurgeon

Dr. Shuman referred plaintiff to Dr. Owen, a neurosurgeon, who examined plaintiff on March 23, 2003. (T. 162-63). Dr. Owen recited the facts of plaintiff's accident and post-accident history. (T. 162). Dr. Owen found that plaintiff's reflexes were intact, but the range of motion in his back was moderately limited on both flexion and extension. (T. 162). Dr. Owen found strength was normal to manual testing. (T. 162). Dr. Owen's impressions were that plaintiff had chronic lumbar pain syndrome due to degenerative discs with protrusions at L3-4 through L5-S1. (T. 163). Dr. Owen suggested that plaintiff attend the Anesthesia Pain Clinic, but plaintiff stated that he was not interested in having cortisone shots into his lumbar spine. (T. 163). Dr. Owen did not recommend surgery for plaintiff's condition, but stated that he might consider some type of laser procedure if plaintiff did not get any relief from his course of physical therapy that Dr. Shuman had recommended.  (T. 163).

### 4.  Dr. Charles Moehs - Independent Medical Examination[5]

Plaintiff was examined on July 17, 2003 by Dr. Charles J. Moehs. (T. 214-15). Dr. Moehs did not find any significant tenderness in plaintiff's low back, and found

---

[5] Dr. Moehs was another consultative physician.

12

that plaintiff was able to flex and extend his back without significant pain. (T. 215).

Plaintiff was able to kneel and squat, and plaintiff's neurological examination was

normal.  Dr. Moehs's impression was that plaintiff had a "history of back injury 1 year

ago."  (T. 215).  According to Dr. Moehs, plaintiff was "slowly returning to full

activities."  Dr. Moehs's opinion was that he anticipated that plaintiff could return to

work, but would not be able to do any heavy lifting or frequent bending.  Dr. Moehs

felt that plaintiff "certainly could do supervisory type work."  (T. 215).

## C.  Functional Capacity Evaluation (FCE)

On January 11, 2005, plaintiff was given an FCE by a physical therapist at the

C.A.N.I. Spine Center in Watertown, New York. (T. 239-43).  The FCE involved tests

of plaintiff's ability to perform many and varied physical functions.  The tests

concluded that plaintiff showed a valid effort on nineteen of the twenty-five tests. (T.

239).  The recommendations of the physical therapist were that plaintiff engage in

general conditioning and endurance strengthening to build up his functional ability,

including stretching to improve flexibility. *Id.*  In addition, the recommendations were

that plaintiff *attend VESID* (Vocational and Educational Services for Individuals with

Disabilities) *for retraining* to assist him in changing positions between sitting,

standing, and walking. (T. 239).  According to the physical therapist, plaintiff reported

that he is able to do all light activities around his home, but feels better when he is

sitting in a hard chair and after taking a hot shower.  (T. 240).  The physical therapist

concluded that plaintiff could presently meet physical demands of medium work,

however, plaintiff's sitting was limited to ten minute intervals. (T. 242).

## DISCUSSION

1.   **Disability Standard**

To be considered disabled, a plaintiff seeking disability insurance benefits or

SSI disability benefits must establish that he is "unable to engage in any substantial

gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than twelve months ...." 42 U.S.C.

§ 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity
> that he is not only unable to do his previous work but cannot, considering
> his age, education, and work experience, engage in any other kind of
> substantial gainful work which exists in the national economy, regardless
> of whether such work exists in the immediate area in which he lives, or
> whether a specific job vacancy exists for him, or whether he would be
> hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. §§ 404.1520

and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently
> engaged in substantial gainful activity. If he is not, the [Commissioner]
> next considers whether the claimant has a "severe impairment" which
> significantly limits his physical or mental ability to basic work activities.
> If the claimant suffers such an impairment, the third inquiry is whether,

14

based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; ... . Assuming the claimant does not have listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920.

The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents him from performing his past work, the burden then shifts to the Commissioner to prove the final step. *Bluvband v. Heckler*, 730 F.2d 886, 891 (2d Cir. 1984).

## 2.    <u>Scope of Review</u>

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986.  In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision.  *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d

15

Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted).  It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258.  However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).  *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983).

## 3.   <u>Treating Physician Rule and Residual Functional Capacity (RFC)</u>

While a treating physician's opinion is not binding on the Commissioner, the opinion must be given controlling weight when it is well supported by medical findings and ***not inconsistent with other substantial evidence***. *See Veino v. Barnhart*,

312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. § 416.927(d).  If the treating physician's opinion is contradicted by other substantial evidence, the ALJ is **not** required to give the opinion controlling weight. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The less consistent the treating physician's opinion is with the record as a whole, the less weight it will be given. *Temple v. Astrue*, 07-CV-6346, 2008 U.S. Dist. LEXIS 3185, *19 (W.D.N.Y. April 17, 2008)(citing *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)).  The ALJ must, however, properly analyze the reasons that the report is rejected. *Id.*  An ALJ may not arbitrarily substitute his own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

In rendering a residual functional capacity (RFC) determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R §§ 404.1545; 416.945. *See Martona v. Apfel*, 70 F. Supp. 2d 145 (N.D.N.Y. 1999)(citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). An ALJ must specify the functions plaintiff is capable of performing, and **may not simply make conclusory statements regarding a plaintiff's capacities**.  *Verginio v. Apfel*, 1998 WL 743706 (N.D.N.Y. Oct. 23, 1998); *LaPorta v. Bowen*, 737 F. Supp. at 183.

In this case, plaintiff argues that the ALJ "ignored much of the medical record." (Plaintiff's Brief at 10).  Although plaintiff's counsel does not specifically refer to the "treating physician rule," he argues that the ALJ ignored some of the treating physician's opinions, together with the opinions of the consultative physicians in

17

determining that plaintiff could perform light work.  This argument is not supported by the evidence in the record.

Plaintiff cites Dr. Heap's statement on November 12, 2002 that plaintiff could only perform "sedentary work." *See* (T. 174).  However, on April 1, 2003, Dr. Heap also concluded that plaintiff was able to "***perform light duty with a limitation of lifting to twenty pounds***."  (T. 169).  This is consistent with the ALJ's finding that plaintiff could perform light work.  Plaintiff argues that Dr. Moehs stated that plaintiff could not engage in any heavy lifting or frequent bending.  Light work does not require heavy lifting or frequent bending. 20 C.F.R. § 404.1567(b).  Thus, Dr. Moehs's opinion does not preclude a finding that plaintiff can perform light work.

Plaintiff also argues that ***one*** of Dr. Shuman's findings on one of plaintiff's early visits on October 3, 2002 was that plaintiff had bone spurs at the L4-5.  Plaintiff argues that Dr. Shuman found positive straight leg raising tests on December 13, 2002.  However, plaintiff's counsel does not mention that Dr. Shuman ***also*** found ***negative*** straight leg raising on October 21, 2004. (T. 235).  The court also notes that most of the other medical reports, even from physicians in Dr. Shuman's group also found negative straight leg raising. (T. 203, 205, 230 - Dr. Huang).  On November 12, 2002, Dr. Heap found positive straight leg raising, but on April 1, 1003, he found that straight leg raising was negative to 90 degrees. *Compare* (T. 173) *with* (T. 168).

While on March 24, 2003, Dr. Owen found that plaintiff had positive straight leg raising bilaterally, the record clearly shows that Dr. Shuman and other physicians within the North Country Orthopaedic Group treated plaintiff for ***several years***, and

*none* of these doctors ever rendered an opinion that plaintiff was totally disabled.  On October 3, 2002, Dr. Shuman did give plaintiff a medical "slip" stating that he had a "partial disability" and should stay out of work, however, Dr. Shuman was referring to the job that plaintiff was performing before he became injured. (T. 211). There is no question that plaintiff cannot return to his former heavy or very heavy work.  In fact, Dr. Shuman noted during January 2003 that plaintiff *can* work, provided he does not lift more than ten pounds or do prolonged sitting. (T. 210).

Plaintiff argues that the January 2005 FCE is "the best evidence of plaintiff's work limitations."  This examination by a physical therapist at the C.A.N.I. Spine Center found that plaintiff could lift "medium work level weight and engage in sitting for ten minute intervals up to 33% of a work day."  The report clearly indicates that the plaintiff can lift *medium* level weight and engage in work activity which does not involve prolonged sitting.  This FCE actually finds that plaintiff can do medium work with limitations.  The ALJ found that plaintiff could perform light work.

Plaintiff's counsel then argues that an individual who is limited to sedentary work may not be able to do the full range of that exertional category if he must alternate between sitting and standing. (Plaintiff's Brief at 13).  While plaintiff's statement is correct, the ALJ in this case did not find that plaintiff was limited to sedentary work.  The ALJ found that plaintiff could do light work.

While the ALJ's opinion does not contain extensive detail about *all* of the medical evidence, the record is very clear that plaintiff has been treated for years by orthopedic physicians who did *not* find him totally disabled.  Plaintiff has been

19

examined by other physicians (Drs. Heap and Moehs) who found him capable of light or even medium level work.  There are many reports from plaintiff's treating physicians that cover years of treatment.  The ALJ was justified in relying on the medical evidence of record from the independent medical examinations and the absence of any opinion that found plaintiff unable to work.

The Second Circuit has stated that although the court will not accept an "'unreasoned rejection of all the medical evidence in a claimant's favor,' the Commissioner need not 'reconcile explicitly every conflicting shred of medical testimony.'" *Galiotti v. Astrue*, No. 06-5913, 2008 U.S. App. LEXIS 4050, *2 (2d Cir. Feb. 25, 2008)(citing *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)).  When as in this case, there are conflicts in the medical evidence, it is the fact-finder's decision that controls.  *Id.*  Where the Commissioner's decision "rests on adequate findings supported by evidence having rational probative force, we will not substitute our judgment for that of the Commissioner." *Id.* (citing *Veino v. Barnhart*, 312 F.3d at 586).

Although plaintiff's counsel argues that the ALJ ignored the evidence in plaintiff's favor, plaintiff's counsel is not citing all the conflicting evidence that does ***not*** weigh in favor of disability.  ***Treating and examining physicians*** did not prohibit work activities, and in fact, found him capable of light work with certain restrictions, such as no prolonged sitting, heavy lifting, or frequent bending. (T. 215).  At best, there is conflicting evidence, and the ALJ's reliance on the evidence in favor of plaintiff's ability to do light work is supported by substantial evidence.

**4.     Vocational Expert**

Plaintiff argues that the ALJ improperly used the Medical Vocational

Guidelines[6] to determine that plaintiff could perform other work in the national

economy.  If a plaintiff has non-exertional impairments that "significantly limit the

range of work" permitted by the plaintiff's exertional limitations, then the ALJ may

not use the Medical-Vocational Guidelines exclusively to determine whether plaintiff

is disabled. *Bapp v. Bowen*, 802 F.2d 601, 606 (2d Cir. 1986).  If the plaintiff's range

of work is significantly limited by his or her non-exertional impairments, then the ALJ

must present the testimony of a vocational expert or other similar evidence regarding

the availability of other work in the national economy that plaintiff can perform.  *Id.*

A vocational expert may provide testimony regarding the existence of jobs in the

national economy and whether a particular claimant may be able to perform any of

those jobs given his or her functional limitations.  *See Rautio v. Bowen*, 862 F.2d 176,

180 (8th Cir. 1988); *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983).

Although the ALJ is initially responsible for determining the claimant's

capabilities based on all the evidence,[7] a hypothetical question that does not present

the full extent of a claimant's impairments cannot provide a sound basis for the VE's

testimony.  *See De Leon v. Secretary of Health and Human Services.*, 734 F.2d 930,

936 (2d Cir. 1984); *Lugo v. Chater*, 932 F. Supp. 497, 503-04 (S.D.N.Y. 1996).  The

Second Circuit has stated that there must be "substantial record evidence to support

---

[6] 20 C.F.R. Part 404, Subpt. P., App. 2 (the Grid).

[7] *Dumas*, 712 F.2d at 1554 n.4.

the assumption upon which the vocational expert based his or her opinion." *Dumas*, 712 F.2d at 1554.

Plaintiff argues that the ALJ erred in applying the medical vocational guidelines to this case. Plaintiff's counsel argues that plaintiff had non-exertional impairments that would prevent the use of the guidelines. The court notes that the ALJ used a vocational expert, and he mentioned her findings in his decision, although he did not include any of her statements in his "Findings."[8] The vocational expert was present and testified at the hearing. She stated that given plaintiff's ability to perform light work, there were unskilled jobs that she could identify. (T. 55). This was true even considering plaintiff's ability to sit, stand, and walk only occasionally during the day.

Plaintiff's counsel asked the vocational expert a hypothetical question which is not supported by any ***medical evidence in the record***, namely, that plaintiff would be required on an unpredictable basis to take three or more ten-minute breaks in addition to his regular breaks. (T. 55-57). Since there is no support for this hypothetical, the vocational expert's answer to this question is not relevant. In any event, the vocational expert explained that three ten-minute breaks are ***not*** significant in a full day's work. (T. 56). Plaintiff's argument that the ALJ disregarded the opinion of the vocational expert is not supported by the record.

---

[8] The court does note that the VE never actually identified specific jobs that plaintiff could perform, but stated that based on the FCE, plaintiff could perform light work, and that minimal breaks would not affect this finding. The court notes that the VE is only required if plaintiff 's ability to do the full range of a particular exertional category of work is significantly limited. *Bapp, supra.* Thus, the fact that the VE's testimony was not complete does not affect this court's decision.

Plaintiff also argues that he has "severe non-exertional impairments" such as (1) a diminished intellect; (2) necessity to change positions frequently; and (3) inability to sit for more than ten-minute intervals and only occasional ability to sit, stand, reach, and engage in repetitive leg and arm movements.  It is unclear what counsel means by a "diminished intellect."  Plaintiff finished the eleventh grade in "regular classes." (T. 39).  He is **not** claiming, nor is there any evidence of, a mental impairment.  Educational level is taken into account by the Medical Vocational Guidelines.  The Guidelines specifically refer to a "limited education" as 7th through 11th grade. 20 C.F.R. § 404.1564(b)(3).  The ALJ specifically used the Guideline that included plaintiff's limited education. (T. 15). *See* 20 C.F.R. Part 404, Subpt. P, § 202.18.  The fact that this plaintiff did not finish high school or was unable to obtain his GED is not a separate "non-exertional" impairment.

With respect to plaintiff's argument that he must change positions frequently, or cannot sit for more than ten minutes, only one of those opinions is supported by the medical evidence in the record.  Plaintiff's treating physicians have stated he should change positions, but there is no evidence to support the physical therapist's opinion that plaintiff can sit for only ten-minute intervals.  The ALJ use of the Grid was supported by substantial evidence.

**6.    Credibility**

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us

to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)). To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record. *See* 20 C.F.R. §§ 404.1529, 416.929; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. March 3, 1998).

_____The ALJ's opinion about plaintiff's credibility is *not* a medical opinion. Plaintiff argues that the ALJ rendered a *medical* opinion by finding plaintiff less than fully credible. The record supports the ALJ's conclusions since none of plaintiff's treating physicians found plaintiff disabled, and the record shows that plaintiff was able to engage in *many* daily activities including strenuous activities such as shoveling snow, utilizing a snow blower, doing household chores, cutting grass, and caring for a new puppy. The ALJ's finding about plaintiff's credibility is supported by substantial evidence.

WHEREFORE, based on the findings in the above Report, it is hereby

RECOMMENDED, that the decision of the Commissioner be AFFIRMED and the Complaint (Dkt. No. 1) be DISMISSED.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette*, 984 F.2d

85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: June 12, 2008

_____
Hon. Gustave J. DiBianco
U.S. Magistrate Judge